Rolando ORREGO, Nikolaos Iakovos, Nurul Chowdhury, Leonie Amaker, and Marta Mendez, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

The UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD), Samuel R. Pierce, Jr., in his official capacity as Secretary of HUD, the Federal National Mortgage Association, the American National Bank and Trust Company of Chicago, as trustee under Trust No. 21438, the 833 Buena Joint Venture, an Illinois partnership, and Town Management Corporation, an Illinois corporation, Defendants.

No. 88 C 1567.

United States District Court,
N.D. Illinois, E.D.

Dec. 7, 1988.

William P. Wilen, Daniel J. Burke, Alicia Alvarez, Legal Assistance Foundation of

Chicago, (Burke now with Chicago Community Development Corporation), Leslie Ann Jones, Edward Feldman, Northwestern University Legal Clinic, James P. Chapman, Chicago, Ill., for plaintiffs.

Anton Valukas, U.S. Atty., Linda A. Wawzenski, Deputy Chief, Civil Div., U.S. Dept. of Justice, Chicago, Ill., Kim Kendrick, Trial Atty., John W. Herold, Asst. Gen. Counsel, U.S. Dept. of HUD, Washington, D.C., for defendant U.S. Dept of HUD.

Ronald Butler, James I. Rubin, Ellen M. Babbitt, Sue Payne, Kevin J. O'Brien, Butler Rubin Newcomer Saltarelli & Boyd, Chicago, Ill., for private defendants.

Edna Selan Epstein, Shalom L. Kohn, Robert J. Harris, Sidley & Austin, Chicago, Ill., for Fannie Mae.

## MEMORANDUM AND ORDER

MORAN, District Judge.

For the last half century Congress has made periodic efforts to provide housing assistance to the nation's low and moderate income families. Congressional measures in large part have been incremental, springing from historical contexts that present pending crises. Federal endeavors began in response to widespread mortgage foreclosures, the drying up of mortgage credit and the lack of construction activity created by the "great depression." Congress enacted the National Housing Act of 1937 "to remedy ... the acute shortage of decent, safe, and sanitary dwelling[s] for families of low income." National Housing Act, ch. 896, § 1, 50 Stat. 888 (1937). This Act established a Federal Housing Authority (now called the Department of Housing and Urban Development ("HUD")) to oversee the disbursement of funds and loans for the development of low rent housing and slum clearance projects.

In 1949 Congress broadened the focus of the nation's housing objectives to reach the "goal of a decent home and a suitable living environment for every American family." S.Rep. No. 84, 81st Cong., 1st Sess., *reprinted in* 1949 U.S.Code Cong. & Admin.News 1550, 1559. By the 1960s, however, Congress had determined that a housing gap existed: millions of middle-income families were unable to finance the purchase of homes but were nonetheless not so poor as to be entitled to public housing. To develop housing for these families Congress passed the National Housing Act of 1961. Following a policy goal enunciated in 1949 to stimulate private enterprise to perform "the major part of the task," *see id.* at 1559, the 1961 Act provided a temporary and experimental measure creating incentives for the private sector to fill the housing void.

The 1961 Act expanded the reach of § 221(d)(3) of the National Housing Act ("NHA"), which had originally provided services to persons displaced by urban renewal and other governmental activities. *See* 12 U.S.C. § 1715*l*. The "(d)(3) program," as it is commonly known, encourages private development of housing for moderate and low income individuals by insuring low interest mortgages for owners who construct and maintain multifamily dwellings. The mortgages bear a market rate of interest during the construction of the building and thereafter bear a below-market rate of approximately 3 per cent. Other incentives are provided including insurance against default, high percentage mortgages with small amounts of equity capital, and various tax deductions and offsets.

Under the Act HUD is required to govern the operation, administration and rental rates of (d)(3) buildings for the life of the mortgages. Most of these mortgages are for a period of 40 years. Federal regulations and agreements, however, gave private developers the right to privatize their buildings by prepaying the full amount due on the mortgage after 20 years. *See* 24 C.S.R. § 221.524(a).[1]

---

1. In 1983 Congress amended the Act to require certain procedures before prepayment could be accepted by HUD. *See* 12 U.S.C. § 1715z–15

("Limitation on prepayment of mortgages on multifamily rental housing").

In 1987 many (d)(3) buildings became eligible for pre-payment. By then, the (d)(3) program was no longer active as a source for development of new housing. Bills were introduced in the House (H.R.4) and the Senate (S.825) containing provisions relating to the prepayment of federally-insured multifamily mortgages. During the spring and summer of 1987 Congress held hearings on the proposed legislation. *See Housing, Community Development and Homelessness Prevention Act of 1987: Hearings on H.R.4 Before the U.S. Congress House Comm. on Banking, Finance and Urban Affairs*, 100th Cong., 1st Sess. (March 1987) ("House hearings"); *Declining Supply of Low and Moderate Income Rental Housing, Before U.S. Senate Comm. on Banking, Housing and Urban Affairs*, 100th Cong., 1st Sess. (June 5, 1987) ("Senate hearings").

On the issue of prepayment of federally-insured housing complexes, the House subcommittee was informed that project-based programs (including Sections 8 and 236 housing, as well as (d)(3) housing) would—at generous approximations—see a 50 per cent reduction by the year 2005 (House hearings at 407 (testimony of Neal Curtin, Deputy Directory, Resources Community and Economic Development Division, General Accounting Office)). Prepayment was predicted to occur most heavily in areas where private owners would expect greater returns—in strong market areas valuable for commercial development or upscale housing.[2] Subcommittee Chairman Henry Gonzalez noted that 3 million low and moderate income families could be affected by prepayment, an eventuality that he considered the "next contributor to homelessness" (House hearings at 461).[3]

Anticipating a crisis in the availability of low and moderate income housing, Congress passed the Emergency Low Income Housing Preservation Act of 1987 ("Emergency Preservation Act").[4] The initial draft of that Act—one step in a very public process—emerged from the Conference Committee on November 6, 1987. It expressly provided for an effective date of November 1, 1987. After subsequent amendments it was passed by the Senate and House of Representatives on Decem-

---

2. The House and Senate subcommittees also took testimony on both sides of the legal and economic debate on curtailing private owners' contractual rights to prepay (*see, e.g.,* House hearings at 419–20 (test. of Conrad Egan, Executive Vice–President, National Corporation for Housing Partnerships, arguing that Congress should exercise caution in abrogating owners' rights and suggesting that such action may amount to an unconstitutional taking); House hearings at 425–427 (test. of Marilyn Melkonian, Pres. of Telesis, arguing that proposed measures would not effectuate a taking given that the owners' investment-backed expectations were satisfied by other statutory provisions); Senate hearings at 100–103 (test. of Melkonian on an early version of H.R. 4 that preserved owners' right to prepay)).

3. Chairman Gonzalez noted that the 20–year periods for housing relations seemed in 1961 "an awfully long time," given that the focus of the program was on the transitional needs of the moderate income families (House hearings at 391). The perception of the problem in 1987, however, has changed due to the significant decrease in the stock of available housing.

4. Congress expressly found that
   ... in the next 15 years, more than 330,000 low income housing units insured or assisted under sections 221(d)(3) and 236 of the National Housing Act could be lost as a result of the termination of low income affordability restriction;

   \*   \*   \*   \*   \*   \*

   ... the loss of this privately owned and federally assisted housing, which would occur in a period of sharply rising rents on unassisted housing and extremely low production of additional low rent housing, would inflict unacceptable harm on current tenants and would precipitate a grave national crisis in the supply of low income housing that was neither anticipated nor intended when contracts for these units were entered into ...
   and it enacted the Emergency Preservation Act
   (1) to preserve and retain to the maximum extent practicable as housing affordable to low income families or persons those privately owned dwelling units that were produced for such purposes with Federal assistance;
   (2) to minimize the involuntary displacement of tenants currently residing in such housing; and
   (3) to continue the partnership between all levels of government and the private sector in the production and operation of housing that is affordable to low income Americans.
   Section 202 ("Findings and Purpose").

ber 21, 1987.[5] The Act requires (d)(3) owners desiring to prepay their mortgages to develop a plan of action for terminating low income affordability restrictions. The Act further conditions acceptance of prepayments on HUD's determination that low income tenants will not be unduly burdened.[6]

The Act was not signed into law by the President until February 5, 1988. Between December 21, 1987 and February 5, 1988, three or four of the 73 owners of the various (d)(3) buildings around the nation that reached the 20–year threshold between November 1, 1987 and February 5, 1988, attempted to privatize by prepayment. One such prepayment is the subject of this litigation.

Plaintiffs are tenants in a federally-assisted moderate and low income apartment building. The owner of the building, private defendant 833 Buena Joint Venture ("Joint Venture"), in an attempt to discontinue federal regulation of the building, prepaid to HUD the remaining amount due on its mortgage. Plaintiffs filed this action as individuals and as members of a class, seeking an order that would void the prepayment transaction and cause HUD to resume federal regulation. Currently before the court are plaintiffs' motion for class certification and cross-motions for summary judgment. We certify plaintiffs' class, grant summary judgment to the Federal National Mortgage Association, deny the remaining defendants' motions for

summary judgment and grant summary judgment to plaintiffs.

*Facts Specific to the Instant Litigation*

The material facts of this case are not in dispute. 833 W. Buena is a 209–unit multi-family dwelling complex located in the Uptown community of Chicago, Illinois, that was constructed and maintained as a (d)(3) building. Its original owner received a federally-insured low interest mortgage and entered into a regulatory agreement with HUD on March 8, 1966. The American National Bank & Trust Company of Chicago (ANB), as mortgagor under a trust agreement, executed a 40–year secured note and mortgage in the sum of $2,700,-000. The note carried an interest rate of $5\frac{1}{4}$ per cent per annum during construction, reduced to $3\frac{3}{8}$ per cent after final endorsement by the Federal Housing Commissioner on January 4, 1968. The note provided that

the debt evidenced by this note may not be prepaid either in whole or in part prior to the final maturity date thereof without the prior written approval of the Federal Housing Commissioner except that a maker which is a limited distribution entity may prepay without such approval after 20 years from the date of final endorsement of this note by the Federal Housing Commissioner.

The parties agree that the "limited distribution entity" language applies to the owners of 833 W. Buena.

**5.** The bill was passed in the Senate by acclamation, without dissent, and was approved 391–to–2 in the House.

**6.** Section 225 of the Emergency Preservation Act, entitled Criteria for Approval of Plan and Action, provides:

The Secretary may approve a plan of action that involves termination of the low income affordability restrictions only upon a written finding that—

(1) implementation of the plan of action will not materially increase economic hardship for current tenants or voluntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available; and

(2)(A) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect—

(i) the availability of decent, safe, and sanitary housing affordable to lower income and very low-income families or persons in the area that the housing could reasonably be expected to serve;

(ii) the ability of lower income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or

(iii) *the housing opportunities of minorities* in the community within which the housing is located; or

(B) the plan has been approved by the appropriate State agency and any appropriate local government agency for the jurisdiction within which the housing is located as being in accordance with a State strategy approved by the Secretary under section 226.

The mortgage and note were originally assigned to defendant Federal National Mortgage Association ("Fannie Mae"), an entity within HUD responsible for the purchase and sale of mortgages insured under the NHA. In September 1968 Congress partitioned Fannie Mae into two separate entities, *see* 12 U.S.C. § 1717(a)(2). Fannie Mae became a privately-owned and HUD-regulated corporate body responsible for conducting the secondary market operation of the old Fannie Mae, and a new entity, the Government National Mortgage Association ("Ginnie Mae" or "GNMA") a federally-owned and -controlled agency, assumed its special assistance, management and liquidation functions. Following the partition, the 833 W. Buena mortgage and note became the property of Ginnie Mae by operation of law (Anthony F. Marra aff., ¶ 5, exh. to Fannie Mae's reply).

On October 19, 1984, Joint Venture purchased the interest in the building, assumed the regulatory agreement and became bound by the mortgage and the se-

cured note.[7] Joint Venture notified HUD and Fannie Mae on October 22, 1987 that it intended to prepay the secured note. It thereafter obtained a loan from ANB in the amount of $2,000,000, $1,850,000 of which has been drawn to retire the federally-insured mortgage ($1,810,759.30) and to pay related costs (approximately $39,000 in fees and closing costs).[8]

On January 4, 1988, Joint Venture tendered the remaining amount due on the mortgage to HUD and subsequently sent rent increase and eviction notices to all the residents of 833 W. Buena, approximately 600 individuals. The named plaintiffs— five residents of the building—thereafter filed suit in this court charging that HUD's acceptance of the prepayment was in violation of the law. Plaintiffs claim (1) the prepayment was premature by one day and that it therefore violated the 1983 amendments, *see supra* note 1, HUD's regulations and the terms of the note, and (2) the prepayment is void by reason of the Emergency Preservation Act.

---

**7.** Joint Venture alleges that "the sole reason" it purchased the building was "because the property had the contractual and regulatory right to prepay the government insured mortgage and note" (private def.am. 12(e) stmt.). Plaintiffs, however, contend that the prepayment privilege would not provide a primary reason for the purchase of a (d)(3) project, but that Joint Venture purchased the property to acquire certain tax benefits and offsets. Plaintiffs' expert, Paul Homer, who has reviewed the necessary documents, submits an opinion to that effect (pl. exh.II), and the view that tax and interest benefit incentives were primary was expressed during the hearings (*see* House hearings at 427 (test. of Marilyn Melkonian, Pres. of Telesis)). While the motivation behind the 1984 purchase is therefore in dispute, we do not find the issue material to our decision, and summary judgment is therefore not precluded.

**8.** The new debt carries an interest rate of one per cent over prime and is due on December 31, 1989. Prior to the loan, in a letter to ANB dated October 27, 1987, Dennis R. Fields, on behalf of Joint Venture, represented that Joint Venture intended to pay off the current debt and release the building from HUD restrictions, thereby allowing for rent increases (pl.exh.H). Joint Venture maintains that it relied upon its right to prepay the federally-insured mortgage. Plaintiffs, however, cite an investigation memorandum from ANB's loan committee finding that "the property can service [ANB's] debt through

existing cash flow from the building" (pl.exh.M), thereby supporting the argument that ANB did not interpret the prepayment transaction as a condition necessary to the loan.

The transactions between ANB and Joint Venture are not germane to the central question of whether the prepayment of HUD is void. HUD contends that this court cannot use its remedial powers to disrupt the legitimate expectations of innocent third parties. Since we do find the prepayment to HUD to be void, there is uncertainty as to the remaining agreement between ANB and Joint Venture. For example, in the Mortgage and Security Agreement between Joint Venture and ANB, Joint Venture represented that "there is no litigation, action, claim or proceeding pending or threatened which might, in any way, manner or respect, materially or adversely affect the Mortgaged Property, the operation or the business thereof, Lender's lien thereon, the collectibility of the Note, the ability of Borrower to repay the Note or the financial condition of the Mortgaged Property or the operation of business thereof" (pl.exh.R. at 5).

The dispute over the potential effect on the rights of ANB as a third party, however, does not preclude our order here. As we explain below, the disruption of expectations by congressional act is constitutional if Congress acts reasonably and consistent with the Fifth Amendment. Potential disputes betwee ANB and Joint Venture are not a subject of this litigation and we need not resolve them here.

## Premature Prepayment

■ The mortgage received its final endorsement on January 4, 1968, and, since prepayment could not occur without HUD's approval until *after* 20 years had passed, plaintiffs argue that Joint Venture could not legally prepay until January 5, 1988. Plaintiffs seek to void the transaction and order re-regulation on the basis of this one-day prematurity.[9] We dispose of this issue initially so that the remaining statutory and constitutional issues are free from unnecessary confusion.

To have standing to challenge the prepayment transaction plaintiffs must have suffered "some threatened or actual injury resulting from the putatively illegal action." *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (citations omitted). Plaintiffs do not claim an injury arising from the prematurity of the payment—they were threatened with termination of their tenancies, but the fact of early prepayment has no relation to that injury. Instead, plaintiffs' only challenge to the prepayment transaction as a whole rests on the Emergency Preservation Act and, since a January 5, 1988 prepayment would have preceded the President's signing of the Act, the premature payment theory adds nothing to plaintiffs' other statutory claim. Plaintiffs therefore lack standing to bring suit on the alleged one-day prematurity.[10]

## Fannie Mae's Motion for Summary Judgment

■ Fannie Mae moves for summary judgment on grounds similar to HUD and on an additional ground that it was acting solely as an agent of HUD. It has been joined here mainly on grounds that it pre-maturely accepted the January 4, 1988 prepayment. Since we reject plaintiffs' claim that the payment was premature, Fannie Mae would be a necessary party to this litigation only if it is implicated in plaintiffs' remaining Emergency Preservation Act claim. HUD, however, is the real party in interest on that claim because Fannie Mae's actions regarding the retroactivity of the 1987 Act were directed by HUD's regulations. Since plaintiffs do not seek any other relief from Fannie Mae, we conclude that it is not a necessary party to this suit and should be dismissed. We therefore grant Fannie Mae's motion for summary judgment.

## Jurisdiction

■ Plaintiffs allege a claim under the Administrative Procedure Act ("APA") and jurisdiction under 28 U.S.C. §§ 1331, 1337 and 1361. The APA, 5 U.S.C. § 702, provides that a

> person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

Under the APA the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706. Excepted from APA review are decisions committed to agency discretion by law or protected by statute from review. 5 U.S.C. § 701(a). Action committed to "agency discretion" are "those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " *Cit-*

---

9. Plaintiffs also claim (1) Joint Venture actually prepaid December 31, 1987, five days before January 5, 1988, and (2) Joint Venture, under the terms of the note and regulatory agreement, could not lawfully prepay until February 1, 1988. Defendants reply that (1) funds were received on December 31, 1987 but were not credited towards the debt until January 4, 1988, and (2) the contract provisions did not require payment on February 1. We agree with defendants on these issues and, further, since we find plaintiffs to lack standing to raise the premature prepayment challenge on the facts of this case, we find plaintiffs' contentions to be without merit.

10. Because we dismiss the premature prepayment claim, and plaintiffs' other statutory challenge is properly based on statutory provisions, we do not address the issue of whether plaintiffs are intended third party beneficiaries of the agreements between Joint Venture and HUD, entitling them to bring an action on those agreements.

*izens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (*quoting* S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)).

We conclude that our review of HUD's actions is appropriate. Congress passed the Emergency Preservation Act to maintain the status quo of (d)(3) housing to the greatest extent feasible. It did so with the express finding that (d)(3) tenants would otherwise be displaced, causing a crisis in this country's national housing programs. Plaintiffs' stake in the lawsuit is "arguably within the zone of interests to be protected or regulated by the statute," *see Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), and they therefore have standing to bring suit. *See also Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).[11]

Some claims by (d)(3) tenants have been held unreviewable under the APA. For example, the federal courts do not review HUD's approval of rent increases since those decisions are wholly within the agency's discretion and there is therefore no law to apply. *Frakes v. Pierce,* 700 F.2d 501 (9th Cir.1983); *Falzarano v. United States,* 607 F.2d 506 (1st Cir.1979); *Harlib v. Lynn,* 511 F.2d 51 (7th Cir.1975); *Hahn v. Gottlieb,* 430 F.2d 1243 (1st Cir.1970). An underlying theme in these cases is that through the (d)(3) program Congress intended to benefit low-income tenants, but there was no intention to grant them a right to seek review of discretionary HUD decisions affecting the program.

HUD, however, has not been given a blanket exception to operate without the prospect of judicial review. Where Congress has provided a legal standard by which a court can review HUD's action, APA relief may be appropriate. It is therefore incorrect to conclude from the rent increase review cases that HUD action will always be shielded from judicial scrutiny. Here the Emergency Preservation Act provides an express rule of law limiting HUD's ability to accept prepayments. HUD's continued recognition of Joint Venture's prepayment, and its failure to resume regulation of 833 W. Buena are, therefore, actions not committed to agency discretion and are subject to this court's review.

Joint Venture responds that the APA does not confer jurisdiction over plaintiffs' claims, citing *Califano v. Sanders,* 430 U.S. 99, 104–07, 97 S.Ct. 980, 983–85, 51 L.Ed.2d 192 (1977). In *Califano v. Sanders* plaintiff brought an action that could not be maintained under 28 U.S.C. § 1331, and the Supreme Court held that Section 10 of the APA is not an independent grant of subject matter jurisdiction. Plaintiffs here, however, derive their cause of action from the APA but do not rely on it for jurisdiction. Nothing in *Califano v. Sanders* suggests that the APA does not grant a cause of action to one who has standing, so long as there is an independent statutory basis for jurisdiction. *Committee for Full Employment v. Blumenthal,* 606 F.2d 1062, 1065 n. 11 (D.C.Cir.1979). Private defendants' arguments fail because jurisdiction is proper under either 28 U.S.C. § 1331 (federal question) or § 1337 (acts of Congress regulating commerce). *See, e.g., Califano v. Sanders,* 430 U.S. at 105, 97 S.Ct. at 984 ("The obvious effect of [the 1976 modification of § 1331], subject only to preclusion-of-review statutes created or retained by Congress, is to confer jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate"); *Metropolitan Area Housing Alliance v. United States Department of HUD,* 69 F.R.D. 633, 636 (N.D.Ill.1976) (finding jurisdiction proper under § 1337 in a suit to

---

11. Plaintiffs satisfy the three-part test for finding standing as enunciated in *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 841 (D.C.Cir.1982):

    (1) the complainant must allege injury in fact; (2) the complainant must assert that arbitrary or capricious agency action injured an interest arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question; and (3) there must be no "clear and convincing" indication of a legislative intent to withhold judicial review.

review HUD action); *David v. Romney*, 355 F.Supp. 29, 42 (E.D.Pa.1973) (same), *aff'd in relevant part*, 490 F.2d 1360 (3d Cir.1974).[12]

■ Joint Venture further contends that the Emergency Preservation Act does not create a private right of action under the doctrine established in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). This argument also fails. Plaintiffs bring suit under the APA, and since jurisdiction is proper they need not rely on an independent cause of action derived from the Emergency Preservation Act. *See, e.g., Carson v. Pierce*, 546 F.Supp. 80, 84 (E.D. Mo.1982) (APA action not defeated by lack of private right-of-action under the statute).

■ If Joint Venture is correct that plaintiffs cannot maintain this action under the APA, summary judgment for defendants still would be inappropriate because without APA review there would be an implied cause of action under the Emergency Preservation Act. In determining whether to infer a private right of action, *Cort v. Ash* directs us to consider whether (1) plaintiffs constitute the class for whose especial benefit the statute was passed, (2) Congress has indicated an intent to allow or preclude a private remedy, (3) a private right of action is consistent with the underlying purposes of the legislative scheme, and (4) the right of action is a traditional state law claim in an area basically the concern of the states. 422 U.S. at 78, 95 S.Ct. at 2087.

Regarding the first *Cort* factor, we determine whether the "language of the statute explicitly confers a right on a class of persons that includes the plaintiff in the case." *Universities Research Ass'n v. Coutu*, 450 U.S. 754, 772, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). In enacting the Emergency Preservation Act, Congress expressly determined that prepayment would subject current (d)(3) tenants to unnecessary and unwanted displacement from their apartments. Further, the 1987 Act prohibits Joint Venture from prepaying unless HUD determines that the Uptown community can provide current tenants with adequate low-rent housing. Although (d)(3) tenants are not the sole intended beneficiaries under the NHA as a whole, *see, e.g., Falzarano v. United States*, 607 F.2d at 509, the statutory language of the Emergency Preservation Act focuses unmistakably on (d)(3) tenants as the specific and identifiable class of beneficiaries.[13]

Although the Emergency Preservation Act was especially enacted to benefit current (d)(3) tenants, it neither expressly confers nor denies plaintiffs a right of action. We therefore turn to the third and, for present purposes, the most important *Cort* factor: whether an implied right of action is consistent with the underlying purposes of the Act. Here plaintiffs' right to enforce the Act is not only consistent with the statutory scheme but it is necessary to the realization of Congress' intent. Where a (d)(3) owner has tendered prepayment, and where HUD accepts this prepayment and rescinds federal regulation over a housing complex, only the (d)(3) tenants are in a position to bring an appropriate challenge. In *Cannon* the Supreme Court emphasized that when the remedy "is necessary or at least helpful to the accomplishment of the

---

**12.** *David*, decided before *Califano v. Sanders*, held that jurisdiction was proper under the APA. That court also found, independently, that jurisdiction was proper under § 1337. Although its decision as to the APA is no longer correct, the holding under § 1337 remains intact.

**13.** In *Falzarano* the court rejected (d)(3) tenants' efforts to bring an implied cause of action against their landlord for excessive rent increases because the plaintiffs were not the sole beneficiaries of the NHA and because Congress placed approval of such increases within HUD's broad discretion. Here, however, the situation is different. It is true that the Emergency Preservation Act confers some benefits on other persons, for example, the added incentives to extend low-income use (*see* Emergency Preservation Act, § 234). However, the context of those incentives, and the focus of the entire 1987 Act, indicates current tenants as the persons for whom the Act was passed. Further, HUD's acceptance of Joint Venture's prepayment is not discretionary and there is therefore no reason to believe Congress placed sole responsibility for the Act's enforcement on HUD.

statutory purpose, the Court is decidedly receptive to its implication under the statute." 441 U.S. at 703, 99 S.Ct. at 1961. Therefore, if there is no right of action under the APA we would infer a private cause of action in favor of the (d)(3) tenants. *Cf. Chrysler Corp. v. Brown*, 441 U.S. 281, 317, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979) (finding availability of APA review the most important factor in its determination that there is no implied right of action).

## Class Certification

■ Plaintiffs move for certification of the following class pursuant to Rule 23 of the Federal Rules of Civil Procedure: "All persons residing at 833 W. Buena Ave., Chicago, Illinois, on January 4, 1988."

Plaintiffs bear the burden of establishing the suitability of a class action. *Eggleston v. Chicago Journeymen Plumbers Local Union No. 130*, 657 F.2d 890, 895 (7th Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982). Under Rule 23(a) there are four prerequisites to the maintenance of a class action. First, the class must be so numerous that joinder is impractical (numerosity). Second, there must be an issue of fact or law common to all class members (commonality). Third, the claims or defenses of the representative parties must be typical of those of the class (typicality). Fourth, the plaintiffs must be fair and adequate class representatives. To maintain a class action plaintiffs must satisfy one of the additional requirements in Rule 23(b). Here plaintiffs seek certification pursuant to Rule 23(b)(2), a provision commonly used for civil rights litigation, which requires that

the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Plaintiffs' proposed class satisfies Rule 23. There are over 600 tenants at 833 W. Buena, so joinder is impractical. Both the facts and the law underlying each tenant's claim is substantially shared by the entire class and the claims of the named plaintiffs typify those of the class members. Plaintiffs seek to void the prepayment transaction and have HUD resume regulation of all the apartments at 833 W. Buena; the remedy they seek would therefore be applicable to the class as a whole.

Defendants' only opposition to plaintiffs' motion for class certification is the inclusion of former 833 W. Buena tenants who moved since notified of the evictions and rent increases. Private defendants oppose their inclusion, alleging they cannot demonstrate injury resulting from defendants' conduct and they have no stake in the outcome of the litigation since only declaratory and injunctive relief is requested. Further, HUD claims that the named plaintiffs will not fairly and adequately represent former tenants' claims. We disagree with these contentions. Plaintiffs allege that the former 833 W. Buena tenants moved as a result of the notification that there would be rent increases, and since such threatened increases were a result of the prepayment their injury is directly attributable to defendants' conduct. The former tenants' claims, so described, are legally identical to the claims of current tenants. Perhaps they, or some of them, may be entitled, in some court, to other relief as well, but the claim here is for common relief. What they seek here is what the present tenants seek. This court has the authority to provide that relief and defendants have failed to convince us that the interest of the named plaintiffs as representatives is in any way antagonistic to the tenants who have since moved out of 833 W. Buena. We therefore find that plaintiffs have satisfied the requirements of Rule 23 and grant their motion for class certification.

## Retroactivity of the Emergency Preservation Act

■ The Emergency Preservation Act was signed into law on February 5, 1988, a month after Joint Venture tendered prepayment to HUD. We assume that the parties knew, and in any event they could have easily ascertained, that the bill had

passed Congress and awaited the President's signature. The bill was the product of a very public process. At the time the transaction was completed, however, there was no effective law to prohibit HUD's actions. We must therefore address whether the Emergency Preservation Act retroactively voided the prepayment.

Section 235 of the Emergency Preservation Act states:

EFFECTIVE DATE.

The requirements of this subtitle shall apply to any project that is eligible low income housing on or after November 1, 1987.

In contrast to the words of Congress, the Secretary of HUD has promulgated the following regulation:

24 C.F.R. Section 248.103. Effective date.

The requirements of this Part apply to any project that is eligible low income housing on or after February 5, 1988.

53 Fed.Reg. 11229 (April 5, 1988). There is no dispute that on November 1, 1987, 833 W. Buena was eligible low income housing.

HUD believes that Congress did not intend the law to apply retroactively, suggesting that the Conference Committee expected the law to be signed by November 1, 1987, or that date was simply a mistake. HUD contends that retroactive application of the law would produce absurd results: it would require regulation of housing that was deregulated, force HUD to undo a complicated set of transactions adversely affecting the settled expectations of ANB as a third party, and discourage future investment by the private sector in the (d)(3) program. HUD argues that because of these "absurd" results we should look beyond the text of the Act to glean Congress' true intentions. HUD further suggests that we defer to its interpretation of the statute.

These contentions are without merit. Although there is no pertinent legislative history on the Act's retroactivity, the plain words of Congress indicate the lawmakers' intentions. If Congress did not want the Act to apply retroactively it need not have provided for an effective date at all. A finding that there is no retroactivity would therefore render superfluous Congress' actions in providing for a November 1, 1987 effective date. By choosing a retroactive effective date Congress wanted to bar those owners who knew of the legislation and, desiring to avoid its effect, would prepay the remaining mortgages while the legislative process delayed enactment. We think retroactive application of the 1987 Act satisfies its primary purpose to preserve the status quo of (d)(3) housing in the face of impending prepayments.

HUD's suggestion that there will be "absurd" results from retroactive application of the Emergency Preservation Act is equally unpersuasive. HUD may express legitimate policy concerns that weigh against the passage of the Act, but Congress has evidently balanced those concerns against the need to preclude further erosion of low rent housing stock. Congress has resolved these conflicting values to the dissatisfaction of HUD, but it is not our role to conform Congress' will to HUD's perception of good housing policy.[14]

Finally, HUD's interpretation of the Act is entitled to no deference when its interpretation directly conflicts with the express intent of Congress. *INS v. Cardoza-*

---

**14.** Plaintiffs filed as an exhibit a May 2, 1988 letter to Secretary Pierce, signed by Sen. Alan Cranston as chairman of the Senate subcommittee on Housing and Urban Affairs, Rep. Henry Gonzalez, as chairman of the House subcommittee on Housing and Community Development and Rep. Fernand J. St. Germain as chairman of the House committee on Banking, Finance and Urban Affairs, strongly criticizing HUD's refusal to implement the retroactivity provision. Post-legislation legislative history should be and generally is viewed with some caution. The letter's characterization of congressional intent is, however, wholly consistent with the intent indicated by the plain wording of the statute, unlike the Secretary's implausible "mistake" scenario. Moreover, the Secretary does not dispute the chronology of events set forth in the letter, and that chronology in and of itself provides support for the plaintiffs' interpretation. HUD's decision to disregard the November 1 date has, obviously, now somewhat complicated matters. But that flows from the conscious choice of an executive department to ignore a legislative command, and the department cannot expect in those circumstances to benefit from the resulting self-inflicted difficulties.

*Fonseca,* 480 U.S. 421, 445–48, 107 S.Ct. 1207, 1219–22, 94 L.Ed.2d 434 (1987); *Chevron, U.S.A. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress") (footnote omitted). Here Congress expressed an effective date of November 1, 1987, and HUD's regulatory interpretation that the effective date is February 5, 1988 cannot be considered persuasive.[15] We therefore conclude that the Emergency Preservation Act is retrospective to November 1, 1987 and, because the requirements contained therein were not followed, the prepayment transaction must be rescinded.

### Constitutionality of the Emergency Preservation Act

Private defendants challenge the constitutionality of the Emergency Preservation Act on three separate grounds: (1) the Act denies them substantive due process, in violation of the Fifth Amendment; (2) the Act unconstitutionally effects a taking of private property for public use, without just compensation; and (3) retroactive application of the Act violates the constitutional guarantee of due process.

### Substantive Due Process and Takings for Public Use

833 W. Buena's original owner's contract with the federal government afforded the right to prepay the mortgage after 20 years without governmental approval. When Joint Venture purchased the building, that provision remained intact. It now claims that the Emergency Preservation Act deprives it of its "absolute right to prepay." Joint Venture urges us to hold that the 1987 Act fails to provide substantive due process because it impairs the federal government's own contractual obli-

gations. By the necessary logic of the argument, Joint Venture implies that Congress could not burden payment rights for any (d)(3) owners, regardless of the effective date of the Act.

■ A statute will withstand scrutiny under the Due Process Clause of the Fifth Amendment if Congress enacts it pursuant to a rational legislative purpose, in a manner that is neither harsh nor oppressive. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (hereinafter *"Gray"*); *Rhinebarger v. Orr,* 839 F.2d 387, 388 (7th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 71, 102 L.Ed.2d 48 (1988). Congressional legislation "adjusting the burdens and benefits of economic life" are presumed constitutional and "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976) (citations omitted).

■ Private defendants support their position by citing two *Lochner*-era cases: *Perry v. United States,* 294 U.S. 330, 350, 55 S.Ct. 432, 434, 79 L.Ed. 912 (1935) and *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). In *Perry,* the Supreme Court invalidated a congressional act that greatly reduced the federal government's obligation to pay a certain sum in gold coin on a federally-issued bond. In *Lynch,* the Court invalidated an act of Congress that revoked the federal government's obligation under War Risk Insurance policies. In both cases Congress acted only for its own convenience in preserving dollars in the Federal Treasury.

To the extent that *Perry* and *Lynch* retain any authority today, these cases are easily distinguished. Private defendants claim that the saving of money lies at the heart of Congress' actions since Congress

---

**15.** Private defendants also contend that the Act does not apply retroactively. In support of this claim they argue that even if 833 W. Buena "was" eligible low-income housing on November 1, 1987, it no longer "is" such housing, nor was it when the law went into effect. This formalistic reasoning illogically twists the plain meaning of the Emergency Preservation Act. The question is whether Congress intended the Act to bar prepayment while the bill passed through the legislative process. If it did, as we so find, then the Act applies to the January 4, 1988 transaction.

could have chosen alternative housing programs, albeit at a greater cost to the government. Whether this claim is correct or not, we do not evaluate congressional housing policy to see if it misplaces the burden of cost on defendants; instead, our limited role under *Perry* and *Lynch* is to see whether Congress acted solely to relieve a debt in the face of a private party's vested rights. Here Congress enacted the Emergency Preservation Act to maintain the level of low income housing available under federal programs, and the Act therefore fulfills a legitimate government concern other than saving the government money.

■ Private defendants further challenge the Emergency Preservation Act by reference to the Contracts Clause. U.S.A. Const., Art. I, Section 10, cl. 1 ("No State shall ... pass any ... Law impairing the Obligation of Contracts ..."). This clause, however, does not by its terms or by precedent apply to actions by the federal government. Private defendants disingenuously argue that because *Perry* and *Lynch* were cited in *United States Trust Co. v. New Jersey*, 431 U.S. 1, 26, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977)—a Contracts Clause case—courts must apply the Contracts Clause standards to actions against the federal government under the Fifth Amendment. *United States Trust*, however, makes no such application, and the law is clear that the standards developed around the Contracts Clause are inapplicable to congressional action. *See, e.g., Gray*, 467 U.S. at 732 n. 9, 104 S.Ct. at 2719 n. 9 ("It could not justifiably be claimed that the Contract Clause applies, either by its own terms or by convincing historical evidence, to actions of the National Government").

The real issue lurking behind private defendants' arguments is a claim under the Takings Clause of the Fifth Amendment, an issue that has received only cursory treatment in footnotes to the parties' memoranda. Joint Venture's basic claim is that it had a property right to prepay the mortgage after 20 years and that Congress has now deprived it of this interest without compensation. Under recent Supreme Court precedent, this argument too must fail.

In *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), the Court rejected a constitutional challenge to a Social Security amendment which repealed the states' rights to withdraw from the Social Security System. Despite the existence of an express statutory provision that allowed states to terminate their coverage—a right that remained in the Act for over 20 years—the Court held that Congress could upset settled expectations as long as it acted in a manner consistent with the Fifth Amendment guaranty of substantive due process:

> While the Federal Government, as sovereign, has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights, see [*Perry* and *Lynch, supra* ], we have declined in the context of commercial contracts to find that a "sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in" the contract. Rather, we have emphasized that "without regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." Therefore, contractual arrangements, including those to which a sovereign itself is party, "remain subject to subsequent legislation" by the sovereign.

477 U.S. at 52, 106 S.Ct. at 2397 (citations omitted).

We hold that the Emergency Preservation Act does not unconstitutionally deprive Joint Venture of a property right. Joint Venture continues to own 833 W. Buena, and will continue, under the Act, to receive reasonable rental returns. It purchased a (d)(3) building in 1984, and except for the expected ability to prepay and raise rents akin to the other Uptown leases, 833 W. Buena substantially retains the same legal status as before. Private defendants refer to the right to prepay the mortgage after 20 years as "absolute," but nothing in the regulatory agreement, note or NHA, surrendered Congress' "enduring" right to ex-

ercise its sovereign authority over the federal housing programs. Even if Joint Venture relied upon its ability to prepay when it purchased 833 W. Buena, the provision allowing prepayment was "simply part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare." *Id.*, 477 U.S. at 55, 106 S.Ct. at 2398.

### Constitutionality of the Act's Retroactivity

Private defendants contend that even if the Emergency Preservation Act is constitutional, it cannot constitutionally be applied retroactively. In evaluating this claim, we again apply the substantive due process standard discussed *supra*.

■ "Retroactive legislation does have to meet a burden not faced by legislation that has only future effects. 'It does not follow ... that what Congress can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.'" *Gray*, 467 U.S. at 730, 104 S.Ct. at 2718 (*quoting Turner Elkhorn, supra*, 428 U.S. at 16–17, 96 S.Ct. at 2892–2893). However, in justifying the retroactivity of a congressional act, the burden imposed is no greater than that required by the Due Process Clause of the Fifth Amendment.

> [T]he strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of

such legislation remain within the exclusive province of the legislative and executive branches.

*Gray*, 467 U.S. at 729, 104 S.Ct. at 2717.

*Gray* involved an application of a 1980 amendment to the Employment Retirement Income Security Act ("ERISA") that retrospectively imposed pension liability on employers withdrawing from pension plans five months prior to the amendment's enactment. Defendants there had argued that they retained the right to withdraw without liability until the amendment was effective and that retroactive application violated the Due Process Clause of the Fifth Amendment. The Court, applying the *Turner Elkhorn* standards, rejected the employers' contention. It held that the retroactivity was justified by a rational legislative purpose in that Congress "utilized retroactive application of the statute to prevent employers from taking advantage of a lengthy legislative process and withdrawing while Congress debated necessary revisions in the statute." *Id.* at 731, 104 S.Ct. at 2717.

■ Under the logic of *Gray*, retroactive application of the Emergency Preservation Act is constitutional. Congress perceived an impending crisis in low income housing and acted with the express purpose of maintaining the status quo of federally-assisted projects. Knowing that some (d)(3) owners would attempt to avoid HUD regulations by tendering prepayment before the President signed the Act into law, Congress chose to apply the Act's provision retrospective to the time of the Conference Committee's report. Joint Venture knew or could have known that the Emergency Preservation Act was pending and nullification of the prepayment transaction is therefore neither harsh nor oppressive.[16]

---

16. The affidavit of Helen Shiller (pl.exh.HH) provides evidence that private defendants knew of the Emergency Preservation Act prior to the prepayment, although it cannot be determined by that evidence that they knew of the retroactive effective date. Yet, as we have said, the process by which the Emergency Preservation Act became law was very public and, if necessary to our decision, we would assume constructive knowledge. However, whether private defendants knew that the Act would apply retroactively is not a material fact that requires resolution. As the Court in *Gray* noted: "We have doubts ... that retroactive application of the [1980 amendments] would be invalid under the Due Process Clause for lack of notice even if it was suddenly enacted by Congress without any period of deliberate consideration, as often occurs with floor amendments or 'riders' added at the last minute to pending legislation." 467 U.S. at 731–32, 104 S.Ct. at 2718–19.

For these reasons, we hold that the Emergency Preservation Act withstands private defendants' constitutional challenge as it applies both prospectively and retrospectively.

### Remedy

All the parties having interest in 833 W. Buena are before the court. Pursuant to 5 U.S.C. § 706(2) we set aside HUD's actions in accepting prepayment and, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, we determine the existing legal rights of the parties to this controversy and declare that transaction null and void. In reaching this conclusion, we are mindful of our duty to balance the appropriate interests before ordering equitable relief that to some extent disrupts the somewhat settled expectations, or at least the hopes, of the parties. Here, however, 833 W. Buena has remained relatively the same between the time of the prepayment and the filing of plaintiffs' actions. Since this suit began the parties have agreed to maintain 833 W. Buena in its (d)(3) status until resolution on the merits. The title insurance on the prepayment transaction specifically exempts coverage over losses occurring because of federal housing law. Our ruling will no doubt affect the second mortgage from ANB; however, we do not think the agreement between ANB and Joint Venture can bar plaintiffs' remedy. *See supra* note 8. The real hardship imposed by our ruling—the limitation on Joint Venture's ability to privatize 833 W. Buena—derives directly from the Act, and our effectuation Congress' action justifies the rescission of HUD's acceptance of the pre-payment.[17]

■ As a final matter, we address HUD's assertion of sovereign immunity. HUD claims that Ginnie Mae is immune from injunctive relief respecting the property that it holds, relying on 12 U.S.C. § 1723a(a). HUD concludes that any injunction against it will run against Ginnie Mae, that agency being a part of HUD, and that since this court is barred from entering an injunction against Ginnie Mae we cannot void the transaction and order HUD to resume regulation over 833 W. Buena.

Section 1723a(a) is a boilerplate statutory provision that parallels other statutory waivers of sovereign immunity. The pertinent part of § 1723a(a) that HUD relies on reads:

> [Ginnie Mae] shall have the power to ... sue and to be sued ... but no attachment, injunction, or other similar process, mesne or final, shall be issued against the property of [Ginnie Mae] or against [Ginnie Mae] with respect to its property.

HUD's motion presents an issue as to whether Congress' intention to retain some sovereign immunity for Ginnie Mae precludes a remedy for plaintiffs' complaint.

Basically, HUD's position is that it is free from injunctive relief under the APA when acting in connection with mortgages held by Ginnie Mae. The statutory text, however, provides a more limited range of immunity: Congress exempted only "attachments, injunctions, or other similar process" when they are issued "against [Ginnie Mae] *with respect to its property.*" Unfortunately, the range of immunity and the purpose for its provision is not made clear from either the text of the statute or its legislative history. *Fox v. HUD*, 532 F.Supp. 540, 541 (E.D.Pa.), *rev'd on other grounds*, 680 F.2d 315 (3d Cir.1982). In *Fox*, the court considered whether § 1723a(a) barred an injunction requiring Ginnie Mae to make funds available for the financing of development projects. The court reviewed the legislative purpose behind Ginnie Mae and concluded that the antiattachment provision of the statute was intended to insulate Ginnie Mae from *in*

---

17. Although the remedy we provide derives from APA review of an agency's action, as a practical matter its effects are also felt by private defendants. The parties do not address the issue of whether a remedy affecting private individuals is appropriate under the APA. We note, however, that all APA actions that enjoin an agency will have consequences on private actors. Here the requirement that HUD rescind the prepayment and resume regulation over 833 W. Buena involves private deafendants, yet the remedy is one against HUD. That private defendants bear the brunt of the remedy is more in the nature of Congress' mandate to HUD than a private right of plaintiffs against the owners of 833 W. Buena.

*rem* injunctive orders with regard to the real property securing mortgages purchased by Ginnie Mae and conceivably the mortgages themselves:

> It is clear from the statutory scheme that Congress was interested in promotion of the housing market, and the GNMA was intended to operate freely in that market. To that end, the anti-injunction clause forbids attachments, injunctions "or other similar process." When considered in the light of GNMA's activities, which are in the purchase and sale of securities representing in some circumstances the credit of the United States or, in other cases, real property, the anti-injunction clauses take on a more restricted meaning. In particular, the initial use of the word "attachment" connotes execution of a lien; following in that vein, "injunction" must apply primarily to the "property" securing mortgage notes held by GNMA.... It would cause no end of disturbances in GNMA's operation if the property underlying mortgages purchased by GNMA were subject to the liens and attachments, or injunctions, that are entered as a routing matter against ordinary debtors or litigants. By contrast, no reason presents itself why GNMA should be exempt from injunctive orders with regard to its other attributes.

*Id.* 532 F.Supp. at 542.

Other courts that have examined statutory provisions enabling the Small Business Administration to sue and be sued—language that essentially parallels § 1723a(a)—have also concluded that Congress intended immunity only over *in rem*-type actions and did not intend greater immunity than that given other federal agencies. *E.g., Ulstein Maritime v. United States,* 833 F.2d 1052 (1st Cir.1987); *Cavalier Clothes, Inc. v. United States,* 810 F.2d 1108 (Fed.Cir.1987); *Related In-*dustries v. United States, 2 Cl.Ct. 517 (Ct. Cl.1983).[18] These courts reached this more limited interpretation of the waiver provisions through analysis of legislative history, which reveals a specific congressional reaction to the Supreme Court ruling in *Federal Housing Administration v. Burr,* 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940). *See Ulstein,* 833 F.2d at 1056; *Related Industries,* 2 Cl.Ct. at 522. In *FHA v. Burr,* the Court held that the enabling statute for the Federal Housing Administration (HUD's predecessor) left the agency amenable to garnishment proceedings despite arguments that without immunity the agency would be overburdened by such processes. 309 U.S. at 248–50, 60 S.Ct. at 492–93. Congress' reaction to this holding did not grant complete immunity from actions grounded in federal statutory law, but instead provided for a limited range of protection against incidental state equity claims. Because plaintiffs pray for injunctive relief that is not incidental to the 833 W. Buena mortgage, but instead originates in HUD's responsibility to regulate the building, we hold that the anti-injunction language in § 1723a(a) does not bar recovery here.

Even if § 1723a(a) precluded entry of an injunctive order against HUD, plaintiffs would still be entitled to declaratory relief. The holding as to the nullification of the prepayment transaction would therefore remain intact, and under the circumstances of this case it would be HUD's legal responsibility to resume (d)(3) regulation over 833 W. Buena.

## CONCLUSION

For the foregoing reasons, this court grants plaintiffs' motions for class certification and summary judgment. Defendants' motion for summary judgment is de-

---

18. We do not know of any court in this circuit that has directly confronted the issue presented here. In *Little v. United States,* 489 F.Supp. 1012 (C.D.Ill.1980), *aff'd without opinion,* 645 F.2d 77 (7th Cir.1981), the plaintiff voluntarily withdrew a request for injunctive relief against the Small Business Administration because of the statutory language, and the court therefore did not address whether such relief was precluded.

HUD contends that the Small Business Administration cases are inapplicable because the statutory language is somewhat dissimilar and because those cases involved other government agencies to which the immunity did not apply. However, the statutory construction in these decisions is applicable, and although other factors supported those rulings we find the analysis of the sovereign immunity question relevant.

nied except that we dismiss Fannie Mae from the lawsuit. The January 4, 1988 prepayment between Joint Venture and HUD is void and HUD is ordered to resume (d)(3) regulation over 833 W. Buena.