**WINSTAR CORPORATION and United Federal Savings Bank, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 90–8C.**

United States Claims Court.

April 21, 1992.

Charles J. Cooper, with whom were Michael Carvin and Robert J. Cynkar, Washington, D.C., for plaintiffs.

John R. Tyler, with whom were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, and Theodore C. Hirt, Asst. Director, U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

In its order of February 21, 1992, 25 Cl.Ct. 147, the court granted in part defendant's Motion for Clarification of the Issues Remaining to be Briefed Respecting the Government's Alleged Contract Breach in order to clarify certain outstanding issues in this and related cases. This opinion elaborates upon the court's February 21 order.

## FACTS [1]

This case involves Congress' passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) [2] and the effect of that Act on plaintiffs' 1984 acquisition of a failing savings and loan institution. Plaintiffs acquired the failing savings and loan, Windom Federal Savings & Loan Association, pursuant to a negotiated agreement with the Federal Home Loan Bank Board (FHLBB) and the Federal Savings and Loan Insurance Corporation (FSLIC). The linchpin of the parties' agreement was the government's assent to allow plaintiffs to employ the purchase method of accounting for the purposes of satisfying regulatory minimum capital requirements. As the court noted in its earlier decision, "the promise of continued treatment of goodwill as a capital asset that could be amortized over 35 years was a negotiated and critical term of this particular transaction. It was critical because it was clear that without it no purchaser would have engaged in this transaction." *Winstar,* 21 Cl.Ct. at 115. Under this purchase method of accounting,

> the book value of the acquired savings and loans' assets and liabilities was adjusted to fair market value at the time of the acquisition. Any excess in the cost of the acquisition (which included liabilities assumed by the acquirer) over the fair market value of the acquired assets was separately recorded on the acquirer's books as "goodwill." In other words, the government agreed to allow the plaintiffs and others in similar circumstances to treat what was a deficit in capital as an asset. Goodwill was considered an intangible asset that could be amortized on a straight-line basis over a number of years. The difference between the aggregate fair market value of the failing thrift's assets was known as "supervisory goodwill," in the context of a supervisory merger, and was recorded on the resulting institution's balance sheet as an asset includable in capital for purposes of satisfying FHLBB's minimum capital requirements.

*Id.* at 113. The terms of the final agreement accepted by the government provided for a thirty-five year period for the amortization of this supervisory goodwill asset.

The passage of FIRREA in 1989, however, altered the arrangement struck between plaintiffs and the government. The new law provided that supervisory goodwill could be amortized over a period of no more than twenty years, and provided that the amount of goodwill included could not exceed a specified percentage of the savings and loan's assets.[3] Plaintiffs subsequently filed a complaint in this court on January 1, 1990, alleging that the exclusion under FIRREA of at least some of plaintiffs' supervisory goodwill constituted a breach of contract and, alternatively, a taking of plaintiffs' contract rights.[4]

On March 28, 1990, the government filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. In its motion, the government contended that no contractual relationship existed between the parties. Relying primarily on *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) *(POSSE),* the govern-

---

1. The factual background of the case is more fully set forth in the court's opinion of July 27, 1990, *Winstar Corp. v. United States,* 21 Cl.Ct. 112 (1990).

2. Pub.L. 101–73, 103 Stat. 183 (Aug. 9, 1989). FIRREA is codified at various sections of Title 12 of the United States Code.

3. The applicable sections of FIRREA provided that certain savings and loan institutions could "include qualifying supervisory goodwill in calculating core capital." 12 U.S.C. § 1464(t)(3)(A) (Supp.1991). "Qualifying supervisory goodwill" was defined by the statute as "supervisory goodwill existing on April 12, 1989, amortized on a straight-line basis over the shorter of—(i) 20 years, or (ii) the remaining period for amortization in effect on April 12, 1989." 12 U.S.C. § 1464(t)(9)(B) (Supp.1991); *see Winstar,* 21 Cl. Ct. at 114. In plaintiffs' case, the shorter period for allowable amortization was the twenty year period.

4. The court does not reach the merits of plaintiffs' taking claim at this juncture. *See Sun Oil Co. v. United States,* 572 F.2d 786, 215 Ct.Cl. 716, 769 (1978) (where a plaintiff presents alternative theories of recovery based on contract and fifth amendment taking rights, recovery on one theory precludes recovery on the other).

ment also argued that plaintiffs' claim, if granted, would have the effect of improperly binding the government's power to regulate. On March 30, 1990, plaintiffs filed a Motion for Summary Judgment as to Liability. After entertaining the arguments proffered by the parties in their briefs and at oral argument, the court ruled on July 27, 1990 that an implied-in-fact contract existed between the parties. *Winstar*, 21 Cl.Ct. at 116–17. The court, however, stopped short of granting plaintiffs' motion for summary judgment, indicating that further briefing would be necessary on the following issues: whether a breach occurred; if so, whether it resulted in injury; and if so, the type and measure of relief appropriate. *Id.* at 117.

In August 1990, the government filed a Motion for Clarification of the Issues Remaining to be Briefed Respecting the Government's Alleged Contract Breach. Following that motion the court heard oral argument in a number of other cases on similar and related claims.[5] This opinion and the court's order of February 21, 1992 constitute the court's disposition of the government's Motion for Clarification. As of May 24, 1990, the date of oral argument, plaintiffs' bank had been placed into receivership.

## DISCUSSION

### I. The existence of a contract

 In its Motion for Clarification, the government reiterates its position that, absent an expressed contract right granting plaintiffs an exemption from future legislation regarding the capital treatment of goodwill, plaintiffs' contract breach claim must fail. In support of its position, the government relies on *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91

L.Ed.2d 35 (1986) (*POSSE*). In *POSSE*, the state of California and employees of several of its public agencies brought suit against the Secretary of the Department of Health and Human Services to prevent implementation of a 1983 amendment to the Social Security Act. The amendment, if implemented, would revoke states' then-existing "right" to withdraw their participation in the social security system. Since the inception of the social security system in 1935, every state, including California, had voluntarily participated in the program. California, and the other plaintiffs, argued that the original Act under which they and other states had participated had created an independent contractual right to withdraw from the system. This withdrawal right, the plaintiffs contended, constituted a protected property interest under the fifth amendment. This property interest, they asserted, was insulated from the reach of another statutory provision in the original Act granting Congress "the right to alter, amend, or repeal any provision" of the Act, 42 U.S.C. § 1304. In enacting the 1983 amendment cancelling that withdrawal right, the plaintiffs argued, the government had taken plaintiffs' protected property interests in violation of the fifth amendment.[6]

The Supreme Court, however, rejected plaintiffs' claim. Emphasizing the inclusion of the "alter, amend or repeal" power granted in the original Act, the Court held that Congress possessed the power to implement the contested amendment. In so holding, the Court sought to clarify the nature of contractual relationships where the government is a party.

> While the Federal Government, as sovereign, has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights, *see Perry v. United States*, 294 U.S. 330,

---

5. Oral argument was held on plaintiffs' motions for summary judgment and the government's motions to dismiss in *Statesman Savings Holding Corp. v. United States*, No. 90–773C (February 8, 1991) and *Barron Bancshares, Inc. v. United States*, No. 90–830C (May 30, 1991). Oral argument was held on the government's motions to dismiss in *Glendale Federal Bank, FSB v. United States*, No. 90–772C (February 28,

1991), *Hometown Financial, Inc. v. United States*, No. 90–843C (April 4, 1991), and *Suess v. United States*, No. 90–981C (June 6, 1991).

6. The fifth amendment provides that "nor shall private property be taken for public use without just compensation." U.S. CONST., amendment V.

350–354 [55 S.Ct. 432, 434–36, 79 L.Ed. 912] (1935); *Lynch v. United States*, 292 U.S. 571 [54 S.Ct. 840, 78 L.Ed. 1434] (1934), we have declined in the context of commercial contracts to find that a "sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in" the contract. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 [102 S.Ct. 894, 907, 71 L.Ed.2d 21] (1982). Rather, we have emphasized that "[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Ibid.* Therefore, contractual arrangements, including those to which a sovereign itself is a party, "remain subject to subsequent legislation" by the sovereign. *Id.*, at 147 [102 S.Ct. at 907].

*POSSE*, 477 U.S. at 52, 106 S.Ct. at 2396–97. Underscoring these tenets of contract interpretation, the Court noted its "often-repeated admonition[ ] that contracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority." *Id.* at 53, 106 S.Ct. at 2397.

Contrary to the assertions of the government, the Court's holding in *POSSE* in no way precludes this court from finding the existence of a contract between the government and plaintiffs. As is evident from its opinion, the Court in *POSSE* recognized that the government has the power to enter into contracts which confer vested rights—rights which the government has a duty to honor. *See Perry v. United States*, 294 U.S. 330, 351, 55 S.Ct. 432, 435, 79 L.Ed. 912 (1935) ("To say that the Congress may withdraw or ignore [its] pledge, is to assume that the Constitution contemplates a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor. This Court has given no sanction to such a conception of the obligations of our Government."); *Lynch v. United States*, 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934) ("Congress was free to reduce gratuities deemed excessive. But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation.").[7]

In *POSSE*, however, unlike the case here, no such vested rights were created as the basic elements of contract formation were absent. In contracts involving the government, as with all contractual relationships, rights vest and contract terms become binding when, after arm's length negotiation, all parties to the contract agree to exchange real obligations for real benefits.[8] In *POSSE*, the Court deter-

---

**7.** The court rejects the government's argument that the *Perry* and *Lynch* decisions are not controlling in this case because the obligation owed by the government in those cases was purely a financial one whereas the obligation owed here is a duty to treat an intangible asset in a certain way. The court does not detect a legally significant distinction between a contract such as the one at issue in *Perry* wherein the government borrowed money from a private party and in return was obligated to pay that money back with interest and a contract like the one at issue here wherein the government asks a private party to engage in a certain activity (*e.g.*, build an airport or purchase an insolvent savings and loan) in exchange for money or some equivalent consideration upon which a fixed value can be placed. In both contractual situations, the legal consideration exchanged can be put in monetary terms and thus damages for breaching the contract can be fixed in monetary terms. Therefore, in this case, as was the case in *Perry*

and *Lynch*, the government can be held liable for monetary damages.

**8.** The validity of all contracts to which the government is a party also depends on a finding that the government representative whose conduct is relied upon possessed actual authority to bind the government. *See El Centro v. United States*, 922 F.2d 816 (Fed.Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991). In the instant case, the government concedes that the relevant FHLBB and FSLIC officials possessed such authority. *See* transcript of oral argument, May 24, 1990, at 86, 94; *see also* 12 U.S.C. § 1729(f) (1989) (FSLIC "is authorized, in its sole discretion and upon such terms and conditions as [it] may prescribe" to extend assistance to failing thrifts).

The sole authority issue raised by the government is whether the relevant FHLBB and FSLIC officials possessed authority to bind Congress from enacting subsequent legislation disrupting

mined that such vested contract rights did not exist. *POSSE*, 477 U.S. at 52, 54–55, 106 S.Ct. at 2396, 2397–98. Although the Court did not explicitly so state, the facts of *POSSE* make it clear that the provisions of the original Social Security Act were not promulgated after negotiation, arm's length or otherwise, between Congress and the plaintiffs who filed suit. As is the case with all legislation, the only "negotiations" or bargaining involved in the enactment of the original Social Security Act and its amendments took place in the halls of Congress. The "rights" at issue in *POSSE*, then, were solely government-created. They were really policy decisions made by the democratic political process. There was no legal consideration for the creation of these "rights." At any time, the government could revoke them *without legal consequence* because the plaintiffs had not bargained for their creation. *See Estate of Samuel E. Bogley v. United States*, 514 F.2d 1027, 206 Ct.Cl. 695, 704–05 (1975) ("It is fundamental that in order to have a valid contract one party must make an offer that is a promise which is conditional upon receipt by the offeror of some act or promise from the offeree, and the offer must be accepted as to all its terms by the offeree."); RESTATEMENT (SECOND) OF CONTRACTS § 71(1) (1981) ("To constitute consideration, a performance or a return promise must be bargained for."); 17 C.J.S. *Contracts* § 34 (Every contract "is the result of, and springs from, an offer and the acceptance thereof. The offer and acceptance must have the characteristics of a bargain and must be conventional counterparts....").[9]

In addition to the absence of the element of bargaining, there was also no agreement

---

the terms of the contract entered into with plaintiffs concerning the capital treatment of supervisory goodwill. *See* Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment at 31–33. The court does not understand this as the true issue raised by this and related cases. The court views this issue as encompassed in defendant's contention that in light of *POSSE* no contract rights exist. The court has been presented with no evidence or argument that FHLBB or FSLIC did not have proper authority in their statutory mandates to engage in the type of or specific transaction involved in this or similar cases.

9. A similar legal issue was presented in *Orrego v. United States Department of Housing and Urban Development (HUD)*, 701 F.Supp. 1384 (N.D.Ill.1988), *rev'd on other grounds sub nom., Orrego v. 833 West Buena Joint Venture*, 943 F.2d 730 (7th Cir.1991). In that case, tenants of a federally assisted moderate and low income apartment building challenged an attempt by the building's private owner to end federal regulation of the apartment. Specifically, the tenants challenged the prepayment by the owner to the Department of Housing and Urban Development (HUD) of the remaining amount due on its federally insured mortgage. The issue in dispute was the nature of the owner's "rights" under the regulatory agreement it entered into with the government. Under the regulatory scheme in effect at the time the owner entered into its agreement, private developers were eligible to "contract" with a government agency which would purchase existing mortgages and give the developers below-market forty-year mortgages on the condition, among others, that they would be limited in the rents they could charge tenants. *See* 12 U.S.C. § 1715*l*(d)(3). In the standard regulatory agreement at the time the owner in *Orrego* "contracted" with the government, owners were permitted to prepay their mortgages after twenty years. *See* 24 C.F.R. § 221.524(a)(ii). Many owners sought to do this in order to end federal regulation and thereby obtain higher market-fixed rents. *Orrego*, 701 F.Supp. at 1387. However, anticipating a decrease in the availability of low income housing because of the prepayment provision, Congress enacted an amendment to 12 U.S.C. § 1715*l*(d)(3) which eliminated the owners' then-existing "rights" to prepay their mortgages. In *Orrego*, the tenants challenged the owner's post-amendment prepayment, arguing that it was an "illegal" act. *Id.* at 1390. In considering the tenant's claim, the court reviewed the *POSSE* decision and found that the amendment did not unconstitutionally deprive the owner of a vested contractual right as the provision allowing prepayment was " 'simply part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare.' " *Id.* at 1396–97.

Thus in *Orrego*, as in *POSSE*, the owner did not have a protected property interest because the "rights" it asserted were solely government-created. The "contract" the owner entered into was a standard agreement which existed pursuant to an established regulatory scheme. The purported contract, unlike the one at issue here, was not the result of arms-length negotiation and an exchange of legally binding consideration. The correct analogy to the instant case would be if in *Orrego* the owner had been encouraged by the government to pay off its mortgage and the government had then prohibited it from renting half its apartments!

in *POSSE* between the government and the plaintiffs, implied or otherwise, to exchange real obligations for real benefits. The provision at issue in *POSSE* permitted voluntary participation of states and state agencies in the social security system. Although the states and their employees paid social security taxes, these were paid in exchange for the right to receive benefits, not in exchange for the ability of the states to withdraw from the system. The California employees paid the same taxes for the same benefits as did all other participants in the social security system. Further, it should be remembered that social security payments are taxes, not insurance premiums voluntarily paid. *Helvering v. Davis*, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307 (1937). States thus received a benefit (an opportunity to provide retirement benefits for their citizens) without having to incur a corresponding binding obligation. Any purported contractual relationship existing between the government and the *POSSE* plaintiffs was therefore invalid for lack of consideration. *See Brannan v. United States*, 7 Cl.Ct. 399, 405 (1985) ("[I]t is basic that consideration is an essential element of any valid contract, whether express or implied in fact."); *see also Lynch*, 292 U.S. at 576, 54 S.Ct. at 842 (finding insurance policies issued by the government to the plaintiffs binding contracts on the basis that the plaintiffs paid consideration, *i.e.* prescribed monthly premiums, to the government); *Estate of Samuel E. Bogley*, 514 F.2d 1027, 206 Ct.Cl. at 704–05 (" '[T]he ingredients of a contract are parties, consent, consideration, and obligation.' ") (quoting *Farrington v. Tennessee*, 95 U.S. (5 Otto) 679, 24 L.Ed. 558 (1877)).[10]

In contrast, a contractual relationship, with all its attendant obligations and duties, existed between the government and the *Winstar* plaintiffs. All the basic elements of contract formation were present: capacity and mutual intent to contract, arms length negotiation, and the exchange of real obligations for real benefits. *See Winstar*, 21 Cl.Ct. at 114–17.[11] The

---

10. The Court would also not have found a contractual relationship existing between the government and the state and local employee plaintiffs as participation by employees of entities enrolled in the social security system was effectively mandatory. *See POSSE*, 477 U.S. at 41 n. 11, 106 S.Ct. at 2394 n. 11. An essential element in the formation of a contract, free will of all the parties, was therefore absent as the employee plaintiffs did not willingly negotiate their participation in the system. A decision to invest in or purchase a failing savings and loan has never been made mandatory to this court's knowledge, and was not so here.

11. The court is not alone in reaching this conclusion. *See, e.g., Far West Fed. Bank v. Director, Office of Thrift Supervision*, 787 F.Supp. 952 (D.Or.1992); *Charter Fed. Sav. Bank v. Director, Office of Thrift Supervision*, 773 F.Supp. 809, 821 (W.D.Va.1991) ("[T]he FHLBB had the discretion to allow or disallow the use of supervisory goodwill over the stipulated time for amortization. The inducement to allow it came, not from the mandate of a regulation, but the FHLBB's need for assistance from plaintiff's institution. This was consideration, and it is one of the essential elements in the parties' legal relationship which characterizes it as contractual in nature."); *Carteret Sav. Bank, FA v. Office of Thrift Supervision*, 762 F.Supp. 1159 (D.N.J. 1991); *Hansen Sav. Bank v. Office of Thrift Supervision*, 758 F.Supp. 240 (D.N.J.1991); *Security Sav. & Loan Ass'n v. Director, Office of Thrift Supervision*, 761 F.Supp. 1277 (S.D.Miss. 1991); *Far West Fed. Bank v. Director, Office of Thrift Supervision*, 746 F.Supp. 1042 (D.Or. 1990); *Security Fed. Sav. Bank v. Director, Office of Thrift Supervision*, 747 F.Supp. 656 (N.D.Fla.1990); *Sterling Sav. Ass'n v. Ryan*, 751 F.Supp. 871 (E.D.Wash.1990); *see also Franklin Fed. Sav. Bank v. Director, Office of Thrift Supervision*, 927 F.2d 1332, 1345 (6th Cir.1991) (Contie, J. dissenting) ("The bargained-for (*quid pro quo* ) forbearance clearly constitutes an integral component of the negotiated agreement between the FHLBB and [plaintiffs] and was not, as the government suggests, merely a gratuitous forbearance. [Plaintiffs'] shareholders bargained for the instant forbearance and provided the government valuable consideration in reliance upon the government's promise to allow [plaintiffs] the right to amortize supervisory goodwill over a 25–year period."). Authority to the contrary is not definitive on the contract issue. *See Franklin Fed. Sav. Bank v. Director, Office of Thrift Supervision*, 927 F.2d 1332, 1341 (6th Cir.1991) (reversing a district court's granting of a preliminary injunction enjoining the Office of Thrift Supervision from excluding supervisory goodwill, but not deciding whether a binding contract existed between the acquiring savings and loan and the government); *Guaranty Fin. Servs., Inc. v. Ryan*, 928 F.2d 994, 998 (11th Cir.1991) (same); *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, No. 90–1678, 1991 WL 201178 at *7, 1991 U.S.Dist.Col. LEXIS 11877 at *19–20 (denying the grant of a preliminary injunction, but not deciding wheth-

court's conclusion is buttressed by the fact that the terms of the separate agreements negotiated between each acquiring savings and loan and the FHLBB and FSLIC substantially differ. This is in contrast with the standard agreements at issue in *POSSE* and *Orrego*, where the entities "contracting" with the government had no choice but to accept the terms of a pre-existing regulatory agreement. The fact that the government was a party to this contract, then, has no bearing on its binding effect. *See Sinking–Fund Cases,* 99 U.S. (9 Otto) 700, 719, 25 L.Ed. 496, 504 (1878) ("The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or municipality or a citizen.").

Approximately forty percent of this court's cases are contract claims involving the federal government. While the government may engage in extremely large and important contractual relationships, it would make all dealings with the government a very elaborate and expensive form of gambling to hold that the government may repudiate a contract whenever subsequent policy considerations dictate that it was not a good or prudent bargain. As James Madison noted exactly two hundred years ago: "Government is instituted to protect property of every sort; as well as that which lies in the various rights of individuals, as that which the term particularly expresses. This being the end of government, that alone is a *just* government which *impartially* secures to every man, whatever is his *own.*" JAMES MADISON, *Property* (1792), *reprinted in* 6 THE WRITINGS OF JAMES MADISON 101, 102 (Gaillard Hunt ed., 1906) (emphasis in original).

In finding the existence of a contract in this case the court agrees with the govern-

ment's assertion, and follows the Supreme Court's holding in *POSSE,* that Congress is free, absent an express and unmistakable intention to the contrary, to enact legislation contravening the terms of prior contractual agreements.[12] Rather, the point the court made in its July 27, 1990 opinion was that when Congress elects to so legislate, the government must still honor the rights of its citizens. *See Winstar,* 21 Cl. Ct. at 116 ("[W]hile Congress' power to regulate is not impaired, the government may be compelled to pay for the results of its actions, especially when in so doing the government actually is paying because it received a benefit."). As discussed more fully below, Congress' decision to regulate in this case had the consequence of exposing the government to potential liability for breach of contract damages or the possibility of having to make restitution to plaintiffs. The assertion that, in order to freely regulate, the government must have the power to disregard the rights and interests of its citizens is a novel proposition that finds no support in the legislative history of FIRREA, or for that matter, in our constitutional tradition. Sovereign power is always restricted, in one sense, by the rights of individuals. However, in our Nation that has never been seen as an improper restriction on regulatory power. Rather, it is the foundation upon which all law and regulation are built. *See Hendler v. United States,* 952 F.2d 1364, 1374 (Fed. Cir.1991) ("In the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession—the right to *exclude* strangers, or for that matter friends, but especially the Government.") (emphasis in original).

Although *POSSE* and well-developed case law makes it clear that the government is at all times free to legislate, that freedom is inherently constrained by the government's obligation to honor its prior contractual commitments, especially when

---

er the parties' relationship constituted "a contract or some less binding form of agreement"); *Flagship Fed. Sav. Bank v. Wall,* 748 F.Supp. 742 (S.D.Cal.1990) (denying injunctive relief, but not reaching the contract issue).

**12.** This principle was recently reaffirmed in *Peterson v. United States Department of Interior,* 899 F.2d 799 (9th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990), a case also relied upon by defendant in its Motion for Clarification.

the government has received a benefit. *See, e.g., Perry,* 294 U.S. at 353–54, 55 S.Ct. at 436 ("The Constitution gives to the Congress the power to borrow money on the credit of the United States, an unqualified power, a power vital to the Government.... Having this power to authorize the issue of definite obligations for the payment of money borrowed, the Congress has not been vested with authority to alter or destroy those obligations."). The limits imposed on the government's sovereign power in this case are analogous to the limits imposed on that power by the fifth amendment. Under well-established fifth amendment jurisprudence, the government may legislate in a way that effects, intentionally or otherwise, a "taking" of an individual's private property, whether it be by physically occupying it or rendering it valueless. The fifth amendment, however, circumscribes that governmental power by requiring that the government pay individuals "just compensation" for actions infringing on their protected property interests. *See Hendler,* 952 F.2d at 1378 ("We emphasize that the issue is *not* whether the Government had the right to impose itself and its activities on these plaintiffs. Whatever right the plaintiffs had to be let alone was overcome by the Government's need in the interest of public health and safety.... The issue before the court ... [is] whether, on the facts before it, the Government took any property by permanent physical occupation, thus obligating it to pay plaintiffs just compensation.") (emphasis in original). Thus, the fifth amendment limits the government's power to take property without precluding its exercise.

In this case, the government's power to regulate must operate within the context of plaintiffs' contract rights. While Congress clearly may alter the regulatory treatment of supervisory goodwill, it must also honor the plaintiffs' rights. The government may breach the contract, but it must pay for the damages the plaintiffs suffer. Any alteration of this principle would undercut our democratic system. It would allow governmental policies to be paid for with a minority's rights.

## II. Exemption from future legislation by Congress

■ In its Motion for Clarification, the government asserts that in order to find the existence of a binding contract right, for which damages can be given, the court must first find that the FHLBB or FSLIC had the authority to grant plaintiffs an unequivocal right to be exempt from future legislation governing the capital treatment of supervisory goodwill. Although the court finds that plaintiffs were *not* granted an exemption from future regulation concerning supervisory goodwill, the court holds that this exemption question is not relevant to the issues before the court. As the court noted in its July 27, 1990 opinion, "plaintiffs are not claiming that the government contractually bound Congress not to change its regulations." *Winstar,* 21 Cl.Ct. at 116. Rather, plaintiffs seek recovery for alleged injuries resulting from Congress' decision to abrogate the government's agreement with plaintiffs. Thus, plaintiffs' claim does not hinge on whether the government granted, or possessed the authority to grant, plaintiffs an exemption, implied or explicit, from subsequent regulation.

## III. Breach of contract

■ Turning to the question of contract breach, the court finds that in enacting FIRREA the government did in fact breach its contract with plaintiffs. It is undisputed that the original agreement between the parties allowed plaintiffs to treat supervisory goodwill as a capital asset and to amortize it over thirty-five years. It is also undisputed that the government, in enacting FIRREA, altered existing regulations both to reduce the amount of supervisory goodwill includable in calculating core capital and to permit supervisory goodwill to be amortized for no more than twenty years.[13]

---

13. FIRREA mandates the phasing out of the use of supervisory goodwill in calculating core capital. Prior to January 1, 1992, the amount of supervisory goodwill includable in core capital cannot exceed 1.5% of total assets. Thereafter, the amount of supervisory goodwill includable

The effect of FIRREA on plaintiffs was to exclude all but $2.7 million of approximately $9.1 million of supervisory goodwill includable before the enactment of the statute. The court holds that FIRREA's alteration of the terms of the original agreement, absent a countervailing contractual right to do so, constituted a breach of contract entitling plaintiffs to damages or restitution. The government has cited no contractually-based right to alter the terms of the original contract.

In finding that the government breached its contract with plaintiffs, the court seeks to make it clear that its decision does not reflect, as the government suggests it would, a judgment by the court upon the Congress' savings and loan policy. Clearly, this court is not a policy-making body. The duty of this court, like any other court, is solely limited to determining the respective rights of the particular parties before it and granting relief to the parties where appropriate. It would be highly improper for this court to consider, as the government seems to suggest it do, the effect of this decision on the government's savings and loan policy. Courts are not established to make policy. Our Constitution, and the people who established that great document, gave the policy-making powers to the executive and legislative branches. In a constitutional democracy such as this one, the court must accept as given policies duly enacted into law such as FIRREA was. Likewise, the courts, when adjudicating the rights of citizens, must not be influenced by the amount at stake, whether it be one cent or one billion dollars. It is as wrong to award one cent that is not merited as it is to fail to award a billion dollars that is justly due. To do otherwise would make a mockery of equal justice under law. In establishing this court, Congress gave it a simple mandate: to hear certain monetary claims brought against the government; to determine the government's liability pursuant to those claims, if any; and to

fix the amount of damages owed to particular plaintiffs. See 28 U.S.C. § 1491 (1982); S.REP. No. 96–304, 96th Cong., 1st Sess. 11 (1979).

## IV. Sovereign acts doctrine

■ In its Motion for Clarification, the government also argues that the sovereign acts doctrine precludes plaintiffs' recovery for breach of contract.[14] Under that doctrine, the government is not contractually liable, absent an express agreement to the contrary, for the consequences of acts performed in its sovereign capacity. See generally Peter S. Latham, The Sovereign Act Doctrine in the Law of Government Contracts: A Critique and Analysis, 7 U.TOL.L.REV. 29 (1975). In Horowitz v. United States, 267 U.S. 458, 461, 45 S.Ct. 344, 344, 69 L.Ed. 736 (1925), the Supreme Court articulated the doctrine as follows:

It has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign. Deming v. United States, 1 Ct.Cls. 190, 191; Jones v. United States, 1 Ct.Cls. 383, 384; Wilson v. United States, 11 Ct.Cls. 513, 520. In the Jones Case, supra, the court said: "The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons...."

(quoting Jones v. United States, 1 Ct.Cl. 383, 384 (1865)).

■ Although the sovereign acts doctrine grants the government immunity

---

in core capital declines each year, so as not to exceed 1.0% of total assets through December 31, 1992; not to exceed 0.75% of total assets through December 31, 1993; and not to exceed

0.375% of total assets through December 31, 1994. 12 U.S.C. § 1464(t)(3)(A).

14. The government also asserts this doctrine as a defense to plaintiffs' taking claim.

from liability on a variety of contractual theories, the doctrine "is not a boundless justification for governmental non-liability." Latham, *supra* at 41; *see also American Satellite Co. v. United States,* 20 Cl.Ct. 710, 715 (1990) ("Mere invocation of the sovereign acts doctrine is not a talisman. The doctrine has limitations."). The doctrine grants the government immunity only where the government action alleged to constitute a breach is "public and general" in nature. Typically, government acts have been considered "public and general" when they impose a broad and general effect upon the society or the economy. *See, e.g., Horowitz,* 267 U.S. at 461, 45 S.Ct. at 344 (government found immune from liability where plaintiff's loss was caused by shipping embargo imposed by government on all shipments of silk); *Tony Downs Foods Co. v. United States,* 530 F.2d 367, 209 Ct.Cl. 31, 34 (1976) (immunity found where Executive Order lifting price freeze "on all commodities and services" caused monetary loss to plaintiff); *Amino Bros. Co. v. United States,* 372 F.2d 485, 178 Ct.Cl. 515, 525, *cert. denied,* 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967) (immunity found where government's opening of dam flood gates to run-off water from heavy rains "affected the public generally and was not directed solely toward the plaintiff"); *J.B. McCrary Co. v. United States,* 84 F.Supp. 368, 114 Ct.Cl. 12, 34 (1949) (immunity found where Executive Order freezing labor wages determined to be "an order of general application affecting all contractors and businesses and laborers everywhere"); *Gothwaite v. United States,* 102 Ct.Cl. 400, 401 (1944) (immunity found where regulations of War Production Board impeding plaintiff's performance affected all entities requiring materials needed for the war effort).[15]

■ Conversely, where the government abrogates through a limited and focused action specific government obligations to a particular class of individuals or entities it has contracted with, the government is not afforded immunity. In these instances, the government acts not in its capacity as sovereign, but in its capacity as contractor. *See, e.g., Everett Plywood Corp. v. United States,* 651 F.2d 723, 227 Ct.Cl. 415, 429 (1981) ("[T]he act [prohibiting plaintiff from cutting timber it had purchased from the government] was neither public nor general—the government unilaterally terminated one contract after deciding continued performance would have been unwise. It would have been an entirely different case if Congress had passed a law immediately prohibiting all cutting in all public forests, but this unilateral termination does not constitute a sovereign act that excuses the government from breach damages."); *Sunswick Corp. v. United States,* 75 F.Supp. 221, 109 Ct.Cl. 772, *cert. denied,* 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755 (1948) ("It does not follow that the action of the Wage Adjustment Board in directing the plaintiff to increase its carpenters' wages can be so isolated under the guise of an act of sovereignty as to permit the Government, in its capacity as a party to the contract, to disavow having had any part in such action, and to disclaim any liability for whatever increased burden this action may have added to the performance of the contract. The increased wage costs for which plaintiff seeks to be reimbursed resulted not from the Government's public and general act in setting up its wartime system for controlling and adjusting wages, nor from any widespread and general application of a device created for this public purpose as a matter of national policy...."). Thus, the distinction may be seen to rest on which hat the government is wearing when the action abrogating the contract is taken. Is it the government as sovereign or the government as contracting party? In this sense, the application of the

---

15. In situations where courts have applied the sovereign acts doctrine to government actions only affecting a small class of individuals or entities, *i.e.* where the government action is not literally "general" in application, emphasis has been placed on the compelling "public" nature of the act. *See, e.g., Wah Chang Corp. v. United* *States,* 282 F.2d 728, 151 Ct.Cl. 41, 51 (1960) (finding that "the temporary taking" of plaintiff's property "for the purpose of facilitating and guarding the secrecy of troop movements in time of war was a 'public and general' act of sovereignty 'performed for the general good' within the meaning of the *Horowitz* doctrine.").

doctrine has hinged on the facts of each case.

■ In order to invoke the sovereign acts doctrine, then, the government bears the burden of showing that its actions "were public, general, sovereign, performed for the public good, and not arbitrary and unreasonable." *American Satellite*, 20 Cl.Ct. at 715 (citing *Air Terminal Servs., Inc. v. United States*, 330 F.2d 974, 165 Ct.Cl. 525, 536 (dissenting opinion of Jones, C.J.), *cert. denied*, 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 38 (1964)). In this case, the government has not made the requisite showings to invoke the doctrine. The pertinent sections of FIRREA at issue here, 12 U.S.C. §§ 1464(t)(3)(A) and (9)(B), preclude the application of the sovereign acts doctrine.[16] Their very purpose was to take away plaintiffs' rights to use supervisory goodwill because the Congress felt its use was no longer good policy. Courts assessing sovereign act claims have not granted immunity where the sole purpose of the government action is to reverse an earlier policy decision later deemed unwise. *See, e.g.*, *Everett Plywood*, 651 F.2d 723, 227 Ct.Cl. at 429 (government's decision to cancel contract to sell standing timber due to its concern that continued logging and road construction would cause damage to soil, watershed and forest resources found not to be a sovereign act); *Sun Oil Co.*, 572 F.2d 786, 215 Ct.Cl. at 759–68 (government's decision to deny a permit and thereby breach oil drilling lease agreement with plaintiffs because of environmental concerns did not constitute a sovereign act); *Freedman v. United States*, 320 F.2d 359, 162 Ct.Cl. 390 (1963) (government's cancellation of contract to sell surplus tanks because of subsequent discovery of presence in tanks of valuable diesel engines found not to be a sovereign act); *Miller v. United States*, 140 F.Supp. 789, 135 Ct.Cl. 1 (1956) (government's cancellation of contract to sell surplus aircraft because of govern-

ment's later decision that sales to plaintiff would be contrary to national interests found not to be a sovereign act).

In the instant case, taking away plaintiffs' right in these sections of FIRREA was not the necessary means to a broad public end, rather it was the government's end goal. On the government's reasoning, *any* statute breaching a contract would be immune under the doctrine merely because its purpose was to breach the contract. This court has never granted government immunity on such a basis. *See Freedman*, 320 F.2d 359, 162 Ct.Cl. at 402 (the sovereign acts doctrine "does not relieve the government from liability where it has specially undertaken to perform the very act from which it later seeks to be excused.... The existence of this court is proof enough that the desire to save money is a poor reason to break an outstanding promise."). Although the court accepts as a given that the government sought to promote the public welfare in enacting FIRREA as a whole, those specific provisions of the Act altering the capital treatment of supervisory goodwill were intended to, and did, impact only upon plaintiffs and those similarly situated entities who had acquired savings and loan institutions. This fact compels the conclusion that sovereign act immunity cannot adhere in this and related cases.

In analyzing the sovereign acts doctrine's applicability to the facts of this case, the court finds it significant that the public purpose the government sought to promote could have been achieved without disturbing plaintiffs' contractual rights. *See Freedman*, 320 F.2d 359, 162 Ct.Cl. at 397–98, 402; *Miller v. United States*, 140 F.Supp. 789, 135 Ct.Cl. at 10–11 (1956); *Weaver Constr. Co.*, 91–2 B.C.A. ¶ 23,800, 1990 WL 39131, 1990 DOT BCA LEXIS 12 at *13 ("[T]he Government is not immune from contract damages for an act which implements national policy if the required implementation could have been achieved

---

**16.** *But see Far West Fed. Bank v. Director, Office of Thrift Supervision*, 787 F.Supp. 952, 958–59 (D.Or.1992) (finding FIRREA to be a sovereign act, but ruling that plaintiffs' claim for rescission and restitution based on frustration of purpose is "entirely consistent with the purposes of the sovereign acts doctrine"). Thus the court notes that even if the sovereign acts doctrine did apply to these provisions of FIRREA, plaintiffs might still obtain relief on a theory of frustration of purpose.

without disturbing contractual relationships."). The government's suggestion, therefore, that a finding by this court that the sovereign acts doctrine is not applicable would somehow defeat the objectives of Congress in passing FIRREA is without merit. Such a suggestion could only be true if it is assumed that the statute's only cure for the savings and loan industry is taking plaintiffs' newly contributed capital to pay for the alleged excesses of past generations. The statute's comprehensive reform and regulatory system give no support to this view of the role of sections 1464(t)(3)(A) and (9)(B). The question in this case is not whether heightened capital standards for savings and loans is a good policy (the court must and does accept Congress' and the President's decision that it is), rather it is the question whether sections 1464(t)(3)(A) and (9)(B) may force plaintiffs rather than the government to pay for this policy. They may not. As James Madison observed:

> If the United States mean to obtain or deserve the full praise due to wise and just governments, they will equally respect the rights of property, and the property in rights: they will rival the government that most sacredly guards the former; and by repelling its example in violating the latter, will make themselves a pattern to that and all other governments.

JAMES MADISON, *Property* (1792), *reprinted in* 6 THE WRITINGS OF JAMES MADISON 101, 103 (Gaillard Hunt ed., 1906).

## CONCLUSION

For the reasons set forth above, the court finds that a binding contract existed between the government and the plaintiffs and that the government breached that contract when Congress enacted FIRREA. Accordingly, this case will move forward to determine plaintiffs' injury, if any, and the appropriate measure of damages or manner of restitution.

IT IS SO ORDERED.